Our next case for this morning is Liggins v. Colvin, and we'll hear again from Mr. Good morning again, Your Honor. Good morning again. Very short. Judge, I know it's way too soon again. Sorry about that. This is quick. Substantial evidence does not support the ALJ's failure to find any limits in Mr. Liggins' ability to sit. The record is almost completely consistent that he has significant limitations in sitting. The only evidence that could be considered contrary would be the opinions of the non-examining state agency doctors, and the ALJ largely rejected their opinions. Mr. Liggins testified that he could only sit for 30 minutes at a time, and then only if he was constantly adjusting his position. His treating doctor, Dr. Osafo, opined that prolonged sitting, among other things, significantly aggravated Mr. Liggins' back pain. In the forms that the administration required plaintiffs to fill out, he consistently stated that sitting was one of the factors that aggravated his back pain. Now, is there any evidence, medical evidence in particular, in the record that shows the relation between pain when standing and pain when sitting? I don't believe that there is any medical evidence in the record that says that. What we have is his doctor's opinion that prolonged sitting would cause problems. That he experiences pain with prolonged sitting. That he experiences pain with prolonged sitting. Now, the state agency doctors didn't address that issue. I think the primary error is that really the ALJ's decision was arbitrary. She rejected the state agency doctor opinions that Mr. Liggins could lift 20 pounds occasionally and 10 pounds frequently, finding that he could lift only half that amount or less. She rejected their opinions that he could stand and walk for six hours a day, finding that Mr. Liggins could only stand and walk two hours a day. Yet she adopted, without explanation, their opinions that he could sit for six hours a day. When treating Dr. Opine, that he could sit less. And she didn't explain how she parsed that out. Why she found that his particular impairments would cause more difficulty standing and walking than sitting. The commissioner in Social Security Ruling 02-1P, which is the obesity ruling, notes that obesity can cause limits in standing and walking and lifting and carrying and sitting, without explaining or stating that it's more likely to cause problems in standing and walking or in lifting than in sitting. We cited some medical literature, not for proof, but just to show that it's certainly medically reasonable that lower lumbar problems can cause problems in sitting, maybe even more problems in sitting than with standing and walking. Yeah, that's what I was getting at, actually. I remember you cited that. We cited that in our brief just to show that the ALJ made really an independent medical determination in somehow deciding that the impairments that Mr. Liggins suffers from would cause problems in standing and walking but not in sitting. There's no basis for that. And he has very severe lumbar sacral spine impairment. In this case, we have electrodiagnostic nerve conduction studies showing very severe, severe marked nerve damage in multiple areas, multiple nerves stemming in the lumbar and sacral spines. In addition, of course, Mr. Liggins weighed between 370 and 380 or 385 pounds, so he had a body mass index of close to 50 or over 50, which is even well above the extreme obesity level. So there really was no basis for the ALJ to reject the treating doctor's opinion that prolonged sitting caused problems, especially because of the consistency in the record. In the most recent treatment note, the treating doctor, Dr. Osafo, established that he prescribed morphine. He said that because the claimant's pain had been unrelenting, they hadn't been able to get a handle on it. He was now prescribing morphine in the form of MS cotton and that Mr. Liggins was to use Vicodin for breakthrough severe pain. Well, that's a doctor who believes that his patient is suffering from very severe and extreme pain. Vicodin is an opioid, right? Yes. So it's pretty strong stuff. And then Mr. Liggins testified that the morphine-based compound didn't help. And so at the time of the hearing, he had been prescribed something different, a fentanyl patch, which is also a narcotic. And I don't believe he testified if that was helping or not. So the doctors were regularly trying different things. His doctor sent him to a pain management specialist, who he saw several times, then sent him to a spinal surgeon. They wanted him to do physical therapy, but he had to get a handle on his pain first before he could even engage in the physical therapy. So there really is just no explanation by the ALJ as to how she reached her findings. She rejected most of the findings from the state agency doctor and then really made up her own residual functional capacity, not tethering that opinion to the decision. In addition, the ALJ's credibility determination in some ways is hard to understand because she mostly actually adopts Mr. Liggins' complaints. In terms of limited carrying, limited standing and walking, limited bending. But then in her credibility findings, she doesn't say, I'm finding him credible for these factors and not credible for these factors. She just kind of paints a broad brush explaining why he's not credible. And one of the things she relies on is that the medical findings were relatively benign. And I think that we explained in our brief that that's just not true. That's just a mischaracterization of the evidence in this case. But he had made some statements that seemed to be wrong about, for example, his termination of smoking and drinking, his efforts to try to do some work, I think furniture moving as late as 2010. He did seem to have some credibility problem. There were issues in particular with the smoking and drinking, although those factors aren't the kinds of things that we're dealing with in the case and don't seem to go to the question of whether the doctors believe that he was in the pain that he stated that he was in. I believe the furniture moving was a one-time, again, was a one-time act in the record without much discussion of that. But there was some work as a mechanic. Yeah, but that was an odd basis for the credibility finding. The work that the claimant did as a mechanic was before he claimed he became disabled. And he said that he did work as a side job, and the ALJ found that he was not being truthful because he characterized it as a side job. But he only earned $10,000, and he said he did some work for family and friends. He wasn't a trained mechanic. He was self-trained. And again, it was for the period prior to the time that he alleged that he became disabled. So I don't see how that really goes to his credibility at a later time. The other thing is that the ALJ said his credibility was undercut because he testified that his wife helped a lot with the household chores, but she worked six days a week. First, many people who work have to come home after work or on their day off and cook, go grocery shopping, do laundry. That shouldn't be a basis for undermining his testimony. But in addition, Mr. Liggins clearly testified that other people went grocery shopping. They had to hire a cleaning service for the house because nobody had time to do it, and he couldn't do it. They hired a yard service. His father, his brother-in-law, and his adult daughter would come over during the day to help do things. So it wasn't even that his wife was able to do all the household chores. They had many other people assisting, and ALJ's reliance on that to undercut his credibility was improper. Thank you. Thank you. Mr. Denke. Thank you, Your Honors. May it please the Court, Joshua Denke for the rappellee. Mr. Denke, you should advise the administrative law judges not to say that it's hard to credit testimony that a wife helps with most of the daily activities because she works six days per week. That's really a stunning statement when you consider studies that are done of the American workforce, and the studies invariably show that even in households where there is both a husband and a wife, the wife continues to do well in excess of 75%, if not more, of the household chores, not to mention the number of households where there is only a mother. I mean, it's just stunning. And all he said is she helps. He didn't say she does everything. She helps with most of the daily activities. So that statement's got to go. Well, Your Honor, Mr. Liggins did also make statements that she was a primary one taking care of the children. Exactly, and she well may have been. Again, I would cite you to plenty of data that suggests that, you know, even the working women are doing most of the child care, too. Thank you, Your Honor. And I appreciate that. The ALJ here did give numerous reasons, even if that statement does have to go, as you say. That doesn't appear to be a basis to remand this to the ALJ. The ALJ gave numerous other reasons for credibility. The ALJ really grappled with the severity of the medical findings of Mr. Liggins' really, you know, his nerve damage, all the rest of the findings that are in this record. I just don't see, you know, they're either mild or they're severe. They seem to be quite severe, and he seems to be in a great deal of pain from them. And if you have inflamed spinal nerve roots, you could be in pain. It's not like he says, you know, I can't mountain climb anymore. He's in pain. Absolutely, Your Honor. To the point that he can't put his own shoes and socks on. The children have to do that for him. And with his size, that's a pretty vivid depiction of how the pain affects him. Yes, Your Honor. The ALJ does deal with much of the evidence that shows the severity. The ALJ found very severe. But I don't see her linking it. You know, I've gone over this opinion a lot of times, and maybe it's just one of the pernicious things about that boilerplate that we've been criticizing. Because she finds inconsistencies where I don't think there are any inconsistencies, and that's troubling. And she also kind of jumps from the treatment records don't suggest that his pain is that bad or he has to lie down half the day. Ergo, he can work all day. I mean, I don't know. No one would hire a person who had to take a nap two hours a day. Absolutely, Your Honor. Well, that's less than half. Well, with respect to the inconsistencies, the ALJ did find numerous inconsistencies that are good here that call into question the reliability of the claimant's statements, such as when Mr. Liggins testified that he stopped smoking and drinking long ago. Right, and why does that matter? This is not a COPD case. And some people stop smoking numerous times. Yes. They think they've stopped and then they relapse and they stop again. Well, it's the totality of the evidence that shows that Mr. Liggins' claims were not really reliable, that the ALJ could rely on it. And it's not just that statement. Why does that undermine an objective medical test such as an MRI? I mean, that's one reason we do these tests, right? We don't have to take somebody's word for it. An objective third party does the MRI. Nerve conduction tests, same thing. The electricity is moving down the nerve the way it moves down the nerve. You don't have to worry about it. Absolutely, Your Honor. But the tests themselves don't translate by themselves into limitations for purposes of disability. But what they do translate is into very strong support for the claims of pain. You know, the doctors who work in these fields see that people with certain, you know, like disc problems or neuroforaminal narrowing or whatever have pain. And so that's, again, you know, he's not saying I have pain for some reason that wouldn't make any sense to people. I mean, this is not a fibromyalgia case where nobody can ever figure out where the pain comes from. Absolutely. The ALJ does not deny that Mr. Liggins experienced pain, and even significant pain. The question was whether that pain prevented substantial gainful activity. And some of the other evidence, you know, when we do have these tests, we do have these tests, a lot of them do show some mild abnormalities. Some show more severe. The ALJ did deal with quite a bit of that. So what we have to turn to is medical opinions in many cases. And don't we need to take into account the kind of treatment the doctors are prescribing? What sorts of medication? What sorts of procedures? Unless you think that they're really irresponsible in the medical profession, if they're giving powerful narcotics to somebody, usually that means they think there's a lot of pain. Absolutely, Your Honor. And the powerful narcotics, in turn, would make you drowsy. I mean, there's a whole list of expected side effects. Sure, sure, and that's another part of the credibility finding, that Mr. Liggins doesn't challenge that. He alleged side effects from medication, but he didn't complain about those to his doctors. So why should he? Maybe the doctor told him, you know, if you take this medication, you're going to feel sleepy, and why would you bring it up? It's often in the records, and the fact of the matter is Mr. Liggins complained of that. The ALJ is dealing with a closed record here, and the ALJ finds that Mr. Liggins makes these statements about side effects from medication, and it's not corroborated. Mr. Liggins, before this court and the district court, does not challenge that at all. And with respect to the medical opinions here, Mr. Liggins has stressed his treating doctor, Dr. Osafo's opinion. The problem with that opinion is, especially with respect to sitting, which is the function that Mr. Liggins really focuses on, that opinion is not necessarily inconsistent with the ALJ's finding. All that Dr. Osafo says is that prolonged sitting and other activities cause pain. Once again, the ALJ did not disagree with that. Dr. Osafo did not specify how long prolonged sitting is. Dr. Osafo did not say it causes such pain that you cannot sit for 6 out of 8 hours a day, or 4 hours, or 2 hours, or a whole day. Well, he says prolonged. So I don't know what you think prolonged means, but it seems to me more than an hour. I don't know that prolonged has to mean 24 hours. Nobody sits for 24 hours. Of course not, Your Honor. But the fact of the matter is Dr. Osafo hadn't had a form here to fill out. Dr. Osafo wrote prolonged sitting, did not otherwise specify. And even if we assume prolonged sitting means 2 hours, Dr. Osafo did not say that this pain would prevent Mr. Liggins from being able to sit that long. Once again, what we're dealing with here is it's undisputed that Mr. Liggins had pain from these severe impairments. It's undisputed in the ALJ's decision. That does not equate necessarily to a disability finding. Well, you know, to get it back for the sitting, he testified he could not sit for more than 30 minutes, and Dr. Osafo said he could not sit for prolonged periods. So he really kind of tied down 30 minutes. Well, Your Honor, with respect, Dr. Osafo did not say he could not sit for prolonged. He simply said that prolonged sitting causes pain. He also mentioned that prolonged other activities cause pain. All right, so then we're requiring him then to sit in pain to do these jobs. Well, Dr. Osafo did not give an opinion that he could not. So the answer to that question is yes. It's the position of the Social Security Administration that this man is supposed to sit there in pain after the 30 minutes while he's working. In some pain, and the question here is, is that pain debilitating and does not allow him to do that work? And all of the medical testimony indicates yes, and the ALJ thought no. We would respectfully disagree with that. We have Dr. Costitas's consultative examination. That does not support these findings. Well, Dr. Costitas was asking a different set of questions, as I recall. She's a neurologist, right? Yes, and Dr. Costitas did a full physical examination. She's looking at numbness in the left fifth digit, maybe an ulnar neuropathy, nerve root compression. She's ordering a sleep study. She's not talking about the back and the rest of that. Nonetheless, Dr. Costitas did do a full physical examination that wasn't just neurological but also of the extremities. The fact of the matter is there's no opinion that actually corroborates Mr. Ligon's claim with respect to sitting. We do have the State Agency Reviewing Physicians' Opinions, which Mr. Ligon's counsel says the ALJ rejected. The ALJ did not reject. The ALJ said these were appropriate at the time that they issued their opinions. The ALJ considered the totality of the evidence and lowered the overall level from light work to sedentary work. And the State Agency Reviewing Physician Opinions with respect to sitting are consistent with the ALJ's residual functional capacity finding in that respect. But to get him back to his pain, he suffered enough pain to get an epidural steroid injection, right? Yes, Your Honor. And not everybody, they don't just routinely provide those. Absolutely, Your Honor. But once again, epidural steroid injections, that does not prove disability. And the ALJ deals with that. The ALJ does discuss that. You keep going back to that, but the fact is before there's disability, his reason for being disabled, he says, is that he's in pain. So we need to get the pain established first. And we need somehow to get level of pain established because even you, I think, would agree that beyond some level of pain, the person simply can't work. That's what the vocational expert testifies to. If the pain requires you to be absent three days or more a month, if the pain requires you to need to take breaks beyond a certain point, the VEs constantly testify, then that eliminates jobs in the economy. So the pain is a predicate, and it's appropriate to look at that. Absolutely, and that's why the ALJ does and does acknowledge that this claimant does experience real pain. And that's why I do keep going back to the pain alone does not prove disability. And when we're looking at doctors' opinions, we really only have a couple here, or a few here, that are dealing with sitting, two of them, by state agency medical experts. Who didn't examine him. Who did not examine him, that is true. So they don't have any idea what he's like actually as a real person. Sure. They're reading a cold file. They did read a cold file. Dr. Osafo does treat him for a long time. Absolutely, and Dr. Osafo did not make an opinion about this that is inconsistent. Once again, no matter how you define prolonged, Dr. Osafo did not state that Mr. Liggins would be unable to perform the work. And if he had, you would have criticized him for usurping the ALJ's function. If he had, we might not be here. I know you would have. We might not be here because if he had, if he did actually hold that opinion and give that, then we might not be here, the benefits may have been great. Okay, thank you very much. Thank you, Your Honors. Anything further, Mr. Schultz? If the ALJ had a question about what Dr. Osafo meant by inability to sustain prolonged sitting, she should have asked. She should have contacted him and asked. The other thing that, you know, there's this question of the inconsistent testimony about smoking and drinking, but how does that allow the ALJ to find Mr. Liggins credible when it comes to his limits in standing and walking but not credible when it comes to his limits in sitting? As Your Honor pointed out, it seems the question is pain. So that he was inconsistent on his testimony about those two things wouldn't allow the ALJ to say, oh, so because of that, I find he can't stand and walk for long periods, but yet he can sit for long periods of time. In addition, I think the main thing, again, is that, and the Commissioner didn't really address this, is that the ALJ did not explain how she reached her residual functional capacity other than, according to the Commissioner's counsel, adopting the state agency doctor's opinions on sitting while rejecting them on standing and walking with no medical basis for that finding. Thank you, Your Honor. Okay. Thanks to both counsel. We'll take the case under advisement.